### ELECTRO–VOICE, INC., Appellant-Defendant,

### v.

### Gray HURLEY, III, Appellee-Plaintiff.

Supreme Court of Tennessee.

Nov. 24, 1975.

Clinton R. Anderson, Anderson & Anderson, Morristown, for appellant.

John C. Porter, Newport, for appellee.

## OPINION

HARBISON, Justice.

This is a workmen's compensation case in which appellee claims benefits because of an occupational disease, pursuant to the provisions of T.C.A. § 50–1101. The trial court found that the condition from which appellee was suffering "is not one of the occupational diseases mentioned in the code", but nevertheless awarded permanent partial disability benefits. The employer has appealed.

There is no contention that the employer has elected to provide full coverage of all occupational diseases in accordance with T.C.A. § 50–1103. It was, therefore, incumbent upon the appellee to establish that the disease from which he is suffering was one of the diseases scheduled in T.C.A.

§ 50–1101, or a disease "which is so closely related as to be classified with" the scheduled diseases. *Tennessee Tufting Company v. Potter*, 206 Tenn. 620, 336 S.W.2d 539 (1960).

In the recent case of *American Insurance Company v. Ison*, 519 S.W.2d 778 (Tenn. 1975), this Court reviewed the requirements for recovery for an alleged occupational disease and stated:

"Finally, if the alleged occupational disease is not one of those named in T.C.A., Section 50–1101, it must be established by medical or other appropriate expert witnesses that it is so 'closely related' to one of the named occupational diseases that it too, should be considered 'occupational.' By 'closely related' we mean (1) that the disease produces pathological effects in the employee which are substantially the same as those resulting from one of the named occupational diseases and (2) the disease in question is caused by the particular hazards of the employment which are known to also cause one of the named occupational diseases." 519 S.W.2d 781.

In the present case it is established by material evidence that the employee is suffering from an allergic reaction to fumes and gases emitted in the manufacturing process which formed part of his working conditions. Although he was employed by appellant for a period of only two months, he began developing an allergic reaction to his working conditions after the first few weeks, and the medical testimony is that the employee was suffering from an inflammation of the nasal passages and sinuses, referred to as sinusitis and rhinitis. These are conditions affecting the upper respiratory system, and neither of the two physicians who testified in the case related these conditions in any way to any occupational disease listed in the statutes above referred to.

Although appellee testified that he was hospitalized on two occasions during September and October 1972, for a total of

twenty-eight days, neither the hospital records nor the testimony of any attending physician have been supplied in the record. Appellee testified that one of the physicians in the hospital diagnosed his condition as "sinusitis and postnasal drip".

After his period of hospitalization, the employee saw Dr. John H. Kinser of Morristown, Tennessee, on three occasions during November and December 1972. Dr. Kinser testified that the employee was suffering from sinusitis and rhinitis, manifested by marked congestion, redness of the nasal passages, tenderness over the sinuses and some congestion in the eustacian tubes. He described the condition as an allergic reaction, which he related to the conditions of appellee's employment, based upon the history given to the physician.

Describing the condition, Dr. Kinser stated that "the fortunate part about this sort of thing, it doesn't develop insidiously deep in the tissues, it develops in the superficial structures of the nose, the sinuses, blocking of the ears and usually watering of the eyes and you can remove these people from it and get maybe less actual damage than you can your black lung disease where the coal dust settles into the deep part of the lungs."

On cross-examination the following is found in the record:

"Q. Doctor, I want to name some diseases and I would like for you to answer after each one whether or not any of those diseases would be closely related or causative to sinusitis or rhinitis. The first one—Lead Poisoning?

"A. Lead poisoning, rhinitis, I believe you said, certainly could be a symptom associated in an individual who concurrently had lead poisoning, I don't think that would be the cause of lead poisoning

"Q. How about Metal Fume Fever?

"A. I'm not familiar with that term, sir.

"Q. Silicosis?

"A. Silicosis of course is in the—I don't know—how far do you want me to

expand on these, Mr. Anderson, these things that you are naming of course are certainly different from sinusitis and rhinitis. Sinusitis and rhinitis actually are more—usually associated as being symptomatic diseases which certainly could be the precursor of a more serious underlying disease and I think we stated previously that that usually was the case in these sort of things.

"Q. Does he have any serious underlying disease that you know of?

"A. Well, obviously not or I would have stated so. That I know of, I didn't say that he didn't have them, I said I didn't know of them, this man was only seen here on three occasions and we treated his acute inflammatory and allergenic situation, which often times is only the precursor of something much more serious.

"Q. Let me ask you like this, if he came in your office and your diagnosis showed that he had silicosis, would you have connected it with breathing of fumes on the job, as he described it to you?

"A. Silicosis, of course by definition is the deposition of silicon into the lung tissues and what gets to the lungs usually passes through the nose and therefore you would assume that it irritated it.

"Q. Your opinion in that case then will be that these fumes could have caused him to have silicosis?

"A. Of course not, sir, I don't know what the fumes were, as you well pointed out, and the fact that we didn't have x-rays of his chest, which is the only way silicosis could be diagnosed. The man's complaints were not of that at all, and silicon—I don't know whether these different fumes that he had contained these or not. Very well could be, if he was breathing fumes that contained silicon then he could very well have silicosis, but that was not what I was treating him for."

On further cross-examination the doctor stated that he did not find any serious underlying systemic disorder, and that since he did not know the nature of the fumes to which the employee was exposed, it would be conjectural on his part as to whether any of the more serious complications manifested in the listed occupational diseases had developed.

Dr. Crampton Morris Helms examined the employee and testified on behalf of appellant. He was shown the statutory list of occupational diseases and testified:

"A   All right. The list, there are twelve entities listed here which all pretty much relate to specific types of occupation and none of these specifically are related to sinusitis or pharyngitis—does that answer your question?

"Q   What about rhinitis?

"A   Rhinitis also none of them are specifically related to rhinitis."

Based upon the foregoing, we are of the opinion that there was no material evidence to support the conclusion of the trial judge that the employee was entitled to disability benefits based upon an occupational disease. There is no evidence that the allergic or respiratory conditions from which he was suffering were sufficiently related to any listed disease as properly to be classified with it.

In view of the foregoing conclusion, it is not necessary to consider the other assignments of error filed on behalf of appellant.

The judgment of the trial court is reversed and the suit is dismissed at the cost of appellee.